**Dorothy JOSEPH, Plaintiff–Appellant,**

v.

**NEW YORK CITY BOARD OF EDUCATION, Defendant– Appellee.**

**Docket No. 98–7246.**

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1998.

Decided March 16, 1999.

Lisa L. George, New York, New York (Barrett Gravante Carpinello & Stern, New York, New York, on the brief), for Plaintiff–Appellant.

Timothy J. O'Shaughnessy, New York, New York (Michael D. Hess, Corporation Counsel for the City of New York, Kristin M. Helmers, New York, New York, on the brief), for Defendant–Appellee.

Hon. Clarence Norman, Jr., Hon. Major Owens, Brooklyn, New York (Lisa L. George, New York, New York, on the brief), filed a brief as Amici Curiae in support of Plaintiff–Appellant.

Before: KEARSE, Circuit Judge, and POLLACK * and CASEY **, District Judges.***

KEARSE, Circuit Judge:

Plaintiff Dorothy Joseph appeals from a final judgment of the United States District Court for the Eastern District of New York, John Gleeson, *Judge,* dismissing her complaint alleging principally that defendant New York City Board of Education ("Board of Education" or "Board") denied her tenure and terminated her employment as a school principal on account of her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1994) ("Title VII"). Following a bench trial, the district court found that Joseph had not carried her burden of proving that the adverse employment decisions were the result of racial animus. On appeal, Joseph contends principally that under the 1991 amendments to Title VII, codified at 42 U.S.C. § 1981a (1994) ("1991 Amendments"), she was entitled to trial by jury and that, even if she had no right to a jury trial, the district court erred in ruling, following the bench trial, that she had failed to carry her burden of establishing intentional racial discrimination. Finding no basis for reversal, we affirm.

## I. BACKGROUND

Joseph, an African–American, was employed by the Board of Education from 1956 until 1991. In 1987, she was appointed principal of Public School 27 ("PS 27"), an elementary school located in the Red Hook section of Brooklyn, a largely poor neighborhood with a predominantly black and Latino population and a history of high crime rates and drug problems. As a new principal, Joseph was to serve a three-year period of probation, during which her performance was to be evaluated. At the end of the third year, the parties agreed that Joseph's probation would be extended for one year.

PS 27 was one of approximately two dozen schools located in Community School District 15 ("District 15"). For most of Joseph's probationary period, her supervisor was William P. Casey, a Caucasian, who held the position of District 15 superintendent.

### A. *Termination of Joseph's Employment as Principal of PS 27*

In order to be granted tenure, a probationary principal was required to receive "Certification of Completion of Probation." As set forth in greater detail in Part II.B. below, through most of Joseph's four-year probationary term, Casey expressed criticisms of her performance. On June 21, 1991, near the end of the four-year period, Casey sent Joseph a letter ("June 21, 1991 letter") stating that he was denying Joseph "Certification of Completion of Probation," and stating that her appointment as principal of PS 27 would "terminate as of the close of business on August 25, 1991."

* Honorable Milton Pollack, of the United States District Court for the Southern District of New York, sitting by designation.

** Honorable Richard Conway Casey, of the United States District Court for the Southern District of New York, sitting by designation.

*** Pursuant to 28 U.S.C. § 46(b) and an order of the Chief Judge of this Court certifying a judicial emergency, this case was heard by an emergency panel consisting of one judge from this Court and two judges of the United States District Court sitting by designation.

Pursuant to the pertinent collective bargaining agreement, this tenure denial was reviewed by a committee designated by Schools Chancellor Joseph Fernandez (the "Chancellor's Committee" or "Committee") on November 8, 12, and 15, and December 3, 1991. The Committee recommended that Fernandez concur in Casey's decision; Fernandez concurred, by letter to Casey dated February 4, 1992. Casey sent Joseph—who by then had reached an agreement with the Board of Education allowing her early retirement—a letter dated February 13, 1992, reaffirming his decision.

### B. *The Present Action*

In June 1994, Joseph commenced the present action, alleging that, in denying her tenure and terminating her employment as principal of PS 27, the Board of Education had discriminated against her on the basis of race. Joseph alleged, *inter alia*, that she was treated differently from the other principals in District 15, all but one of whom were white, and differently from all previous principals of PS 27, all of whom were white. She also contended that PS 27 was accorded less support from District 15 than were schools with white principals and a higher percentage of white students. Joseph demanded, *inter alia*, a jury trial, invoking the 1991 Amendments.

Following the completion of discovery, the Board moved, to the extent pertinent here, to strike Joseph's demand for a jury trial. The Board contended that the claims asserted by Joseph challenged conduct that occurred prior to November 21, 1991, and that the 1991 Amendments were not applicable because they became effective on November 21, 1991, and were not retroactive.

In a Memorandum and Order dated February 3, 1997 ("1997 Opinion"), the district court granted the Board's motion. Noting that Joseph was notified of the denial of tenure by the June 21, 1991 letter and was informed at that time that her employment as principal of P.S. 27 would terminate on August 25, 1991, the court concluded that "state law is clear that the decision was final at the time it was made by the superintendent," *i.e.*, June 21, 1991:

Both parties agree that in order for plaintiff to be entitled to the benefits of the 1991 Amendments, her claim must have ripened after November 21, 1991. A claim ripens when the plaintiff receives definite notice of discharge. *Miller v. International Telephone and Telegraph*, 755 F.2d 20, 23 (2d Cir.1985). The question presented is whether plaintiff received such notice prior to November 21, 1991.

The New York State Education Law, § 2573(6), states:

In a city having a population of four hundred thousand or more, at the expiration of the probationary term of any persons appointed for such term, the superintendent of schools shall make a written report to the board of education recommending for permanent appointment those persons who have been found satisfactory and such board of education shall immediately thereafter issue to such persons permanent certificates of appointment.

N.Y. Educ. Law § 2573(6) (McKinney 1994).

Under a literal reading of this law, the decision not to retain a principal beyond the probationary period is within the sole province of the district superintendent. Section 2573 contains no provision for review or reversal of these decisions by the chancellor of the central board.

Additionally, the New York State Court of Appeals has repeatedly examined this provision of the Education Law and has clearly stated that the law applies as written. The discretion to grant tenure to a principal upon completion of the probationary period lies exclusively with the district superintendents. *Matter of Taylor v. Berberian*, 61 N.Y.2d 613, 471 N.Y.S.2d 843, 459 N.E.2d 1280

(N.Y.1983). The language of § 2573 also denotes a duty on the part[ ] of the community school board to comply with the tenure recommendations of the superintendent. *Matter of Caraballo v. Community School Bd. Dist. 3*, 49 N.Y.2d 488, 492–93, 426 N.Y.S.2d 974, 976, 403 N.E.2d 958 (1980).

Additionally, Joseph has submitted a portion of the *Board of Education Pedagogical Review Manual*, published by the Board's Office of Appeals and Reviews. This manual clearly states that tenure decisions of district superintendents are final. *See* Plaintiff's Exhibit G at 25. The manual does not state that the findings of these reviews, subsequent votes by the local board, or recommendations of reversal by the Chancellor are binding on the district superintendent. Indeed, the manual states that the district superintendent can stand on his or her original decision, regardless of the recommendations of the Chancellor's report. *See* Plaintiff's Exhibit G at 30. Based upon the applicable law, its interpretation by the Court of Appeals, and the internal regulations of the Board of Education, plaintiff was terminated pursuant to the June 21, 1991 letter.

1997 Opinion at 4–6 (footnotes omitted). The court observed that

[t]he plaintiff in *Caraballo* was an elementary school principal who was "recommended" for tenure by the district superintendent. However, the district school board refused to issue the Certification of Appointment officially granting tenure. The Court of Appeals held that the district school board's function was essentially ministerial, and thus it could not reverse the decision of the district superintendent. *Caraballo*, 49 N.Y.2d at 492, 426 N.Y.S.2d 974, 403 N.E.2d 958.

1997 Opinion at 5 n.2.

The district court also noted that in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), the Supreme Court

held that a discrimination action ripened when the *Ricks* plaintiff was notified that he was not getting tenure, not when the grievance was denied. Hearing a grievance or an appeal is an effort to change a prior decision, not to influence the decision before it is made. *Id.* at 261, 101 S.Ct. 498. Aspirants for academic tenure should not ignore available opportunities to request reconsideration, but such requests cannot extend the limitations periods applicable to civil rights laws. *Id.* at 261, n. 15, 101 S.Ct. 498.

As in the *Ricks* case, Joseph was denied tenure and was given the opportunity for review by another body. In both instances, the discriminatory action took place when the tenure decision was made, not when collateral reviews became final. This initial denial of tenure is the wrong for which plaintiff seeks a remedy.

1997 Opinion at 7. The court also stated that

[e]ven if this court were to allow the plaintiff to use her actual discharge date, August 25, 1991, as the date when her claims ripened, that date is still prior to the enactment of the 1991 Amendments, so she still would not be entitled to a jury trial. . . .

*Id.* at 6 n. 3.

A four-day bench trial ensued. Following the trial, the district court found, as set forth in greater detail in Part II.B. below, that Joseph had failed to prove that Casey's decision was the result of intentional racial discrimination. Judgment was entered dismissing the complaint, and this appeal followed.

## II. DISCUSSION

On appeal, Joseph contends principally that she is entitled to a new trial before a jury on the ground that her claims arose after November 21, 1991, following the Chancellor's February 1992 approval of

Casey's decision. She also contends, if she was not entitled to a jury trial, that the district court erred in ruling against her on the merits. We reject both contentions.

## A. Applicability of the 1991 Provision for Jury Trial

Prior to the 1991 Amendments, a Title VII plaintiff had no right to seek relief in the form of money damages. *See, e.g., Landgraf v. USI Film Products,* 511 U.S. 244, 252, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 416–21, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Further, prior to those amendments, the Supreme Court had never recognized a Title VII plaintiff's right to a jury trial. *See, e.g., Landgraf v. USI Film Products,* 511 U.S. at 253–54 n. 4, 114 S.Ct. 1483; *Lytle v. Household Manufacturing, Inc.,* 494 U.S. 545, 549 n. 1, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990) (assuming without deciding that there was no right to a jury trial). The 1991 Amendments grant a plaintiff the right to seek damages for intentionally discriminatory treatment in employment in violation of Title VII, *see, e.g.,* 42 U.S.C. § 1981a(a), and further provide that "[i]f a complaining party seeks ... damages under this section ... any party may demand a trial by jury," *id.* § 1981a(c).

The 1991 Amendments became effective on November 21, 1991, and the Supreme Court has ruled that the provisions of § 1981a allowing a plaintiff to recover money damages do not apply to cases arising before their enactment, *see Landgraf v. USI Film Products,* 511 U.S. at 282–86, 114 S.Ct. 1483, *i.e.,* do not apply "to conduct occurring before November 21, 1991," *id.* at 282, 114 S.Ct. 1483. Since the right to a jury trial is expressly linked to a request for damages allowable under § 1981a, the right to a jury trial also does not apply when the conduct complained of occurred prior to November 21, 1991. *See Landgraf v. USI Film Products,* 511 U.S. at 281, 114 S.Ct. 1483.

In order to bring her case within the ambit of the 1991 Amendments, Joseph argues principally that the conduct of which she complains was not completed until February 4, 1992, at the earliest, when the Chancellor concurred in Casey's decision not to grant Joseph tenure. The law is, however, to the contrary.

█ A claim under Title VII for a discriminatory denial of tenure arises when the employee receives definite notice of the tenure decision. *See Delaware State College v. Ricks,* 449 U.S. 250, 258–59, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). This is so even if the actual discharge date is later, *see id.* at 259, 101 S.Ct. 498, and even if the tenure denial is subject to a grievance procedure, administrative review, and possible reversal, *see id.* at 260–61, 101 S.Ct. 498. Similarly, a claim for discriminatory discharge arises when the employee receives "a definite notice of the termination." *Miller v. International Telephone & Telegraph Corp.,* 755 F.2d 20, 23 (2d Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985). In *Delaware State College v. Ricks,* for example, a tenure committee voted in March 1974 to deny the plaintiff tenure, and the plaintiff commenced a grievance proceeding. On June 26, 1974, the college sent Ricks a letter officially informing him of the tenure decision. The Supreme Court held that the date on which Ricks's denial-of-tenure claim arose was no later than June 26, 1974, the date the letter was sent, even though at that time the grievance proceeding was ongoing. *See id.* at 262 & n. 17, 101 S.Ct. 498.

█ In the present case, as discussed by the district court in its 1997 Opinion, described in Part I.B. above, Joseph was notified of Casey's decision to deny her tenure in June 1991, and that decision was final under New York law. Tenure decisions affecting New York City public school principals are governed by the New York Education Law, *see* N.Y. Educ. Law § 2573(6) (McKinney 1995 & Supp.1999), which, in New York City, vests plenary

power over such decisions in the district superintendents. *See, e.g., Matter of Taylor v. Berberian,* 61 N.Y.2d 613, 615, 471 N.Y.S.2d 843, 843, 459 N.E.2d 1280 (1983) ("In cities having a population of 400,000 or more, the discretion to grant tenure to a principal upon completion of his or her probationary period lies exclusively in the superintendent of schools...."); *Matter of Caraballo v. Community School Board District 3,* 49 N.Y.2d 488, 491–93, 426 N.Y.S.2d 974, 976, 403 N.E.2d 958 (1980) (reversing community school board's refusal to accede to the district superintendent's tenure recommendation).

Similarly, the pertinent regulations of the Board of Education, introduced by Joseph at trial, provide that the decision of a district superintendent to deny a probationary principal Certification of Completion of Probation, thereby preventing the principal from gaining tenure, is final. *See* N.Y.C. Board of Education Regulations and Procedures for Pedagogical Ratings 23–25. Although the superintendent's denial of tenure to a probationary principal is reviewed by a Chancellor's Committee, which prepares a report, and then by the Chancellor himself, who sends a recommendation to the superintendent, the superintendent is entirely free to accept or reject that recommendation. *See id.* at 29–30. The regulations provide that if the superintendent "stands on the original decision upon review of the [Committee] Report, no further action is required." *Id.* at 30. Thus, the reviews of the district superintendent's denial of tenure to a probationary principal are entirely advisory.

Accordingly, Casey's decision to deny Joseph tenure and terminate her appointment as PS 27's principal was final as of the time it was made in June 1991. His February 1992 letter to Joseph reaffirming that decision did not make his initial decision any less final. Since Joseph has not asserted any claim that discriminatory conduct occurred after November 21, 1991, the district court properly struck her demand for a jury trial.

B. *The Challenges to the District Court's Ruling on the Merits*

Joseph contends that even if she was not entitled to a jury trial, the judgment dismissing her complaint should be reversed because the district court erred in assessing the evidence presented at the bench trial. Stating that the district court "held that defendant had come forward with 'overwhelming evidence' of a nondiscriminatory reason for the denial of tenure to Ms. Joseph," but that "the District Judge did not articulate those nondiscriminatory reasons which comprised such 'overwhelming evidence'" (Joseph brief on appeal at 10), Joseph argues that the court's failure to find racial discrimination was error "as a matter of law" (*id.* at 29) because the court failed properly to weigh the evidence. (*See, e.g., id.* at 28 (court "assigned no weight to the fact that plaintiff-appellant had inherited a 'failing' school where the math and reading scores of the students on standardized tests were chronically low"); *id.* ("gave no weight to the testimony of plaintiff-appellant and her witnesses that because the student population was predominantly Black and Hispanic and she was a Black principal that the school received few resources from the Superintendent and the District"); *id.* at 28–29 (erred in "declining to give any weight to the documentary evidence and testimony of the plaintiff-appellant's witnesses and [in] crediting the testimony of Superintendent Casey regarding his claim that neither he nor the district while he was in charge engaged in benign neglect of PS 27").) Joseph contends that

[t]he course of conduct which the superintendent and the District followed was one that was bound to result in Ms. Joseph and PS 27 "failing" and, ultimately, exclusion of Ms. Joseph from serious consideration for tenure and even the ultimate denial of tenure. Thus, the result "bespeaks discrimination" and no evidence that it was caused by racial animus was necessary for a

finding of intentional discrimination in violation of Title VII.

(*Id.* at 29.) These contentions are both legally and factually flawed.

A plaintiff who claims racial discrimination in the denial of tenure and the termination of employment in violation of Title VII has the ultimate burden of proving, *inter alia,* that those employment decisions were the result of intentional discrimination against her on the basis of race. *See generally Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Findings with regard to the existence of discriminatory intent are findings of fact, *Pullman–Standard v. Swint,* 456 U.S. 273, 287–90, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), as are findings of discrimination, *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), and causation, *see, e.g., Wellner v. Minnesota State Junior College Board,* 487 F.2d 153, 156 (8th Cir.1973), and such findings may not be set aside unless they are clearly erroneous, *see, e.g., Anderson v. Bessemer City,* 470 U.S. at 573, 105 S.Ct. 1504; *Pullman–Standard v. Swint,* 456 U.S. at 290, 102 S.Ct. 1781; Fed.R.Civ.P. 52(a).

Assessments of the credibility of witnesses are peculiarly within the province of the trier of fact and are entitled to considerable deference. *See, e.g., Anderson v. Bessemer City,* 470 U.S. at 573–75, 105 S.Ct. 1504. "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. Bessemer City,* 470 U.S. at 575, 105 S.Ct. 1504. And "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574, 105 S.Ct. 1504; *see United States v. Yellow Cab Co.,*

338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949).

The fact that there may have been evidence to support an inference contrary to that drawn by the trier of fact does not mean that the findings were clearly erroneous. *See, e.g., Healey v. Chelsea Resources, Ltd.,* 947 F.2d 611, 618 (2d Cir.1991). The weight of the evidence is an argument to be made to the factfinder at trial, not a ground for reversal on appeal. *See, e.g., Schwartz v. Capital Liquidators, Inc.,* 984 F.2d 53, 54 (2d Cir. 1993) (per curiam); *United States v. Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989).

In the present case, contrary to Joseph's contention, the district court made detailed findings as to the reasons for the denial of tenure to Joseph as principal of PS 27, and it amply supported its findings with citations to testimony it credited and to documents introduced into evidence. Announcing its findings of fact from the bench, the trial court discussed the evidence as to each of the four years in Joseph's probationary period.

As to the first year, 1987–1988, the court found that Joseph "was sent several letters about problems at PS 27 and deficiencies in her supervisory performance," including a March 31, 1988 letter expressing concerns relayed by PTA members as to, *inter alia,* "discipline at lunchtime, particularly in the school yard"; "children in the hallways of the school, in the bathrooms of the school and the lack of a standard procedure for dealing with students whose teachers are absent, for whom there is no substitute teacher"; and "dismissal procedures, disruptive use of the public address system during the school day and the need for a uniform discipline code as well as the inappropriate use of a paraprofessional." (Trial Transcript, January 29, 1998 ("Tr."), 515–16.) The court noted that "Casey made seven specific requests of Ms. Jo-

seph to address these problems" (Tr. 516), and it found that

[d]uring the 1987 to '88 school year, plaintiff's supervisory performance was deficient. She was informed of these deficiencies in a letter from Casey dated June 20th, 1988. It's Defendant's Exhibit 7. She failed to develop and disseminate and implement a school-wide discipline code. She continued the inappropriate assignment of a paraprofessional despite several requests for her to cease that practice and only ceased that practice upon being ordered to do so. She failed to develop and implement a standard procedure for assigning children during the absence of teachers.

She had poor relations with parents, particularly the Executive Board of the PTA. She failed to develop a program to improve reading ability as indicated by standardized test results.

. . . .

Ms. Joseph had other documented deficiencies and performance as well. She failed to submit timely requests for funding for federal and state programs. Throughout the trial there were references to Chapter One program and the PCEN program. Those are federal and state respectively funded programs for which Ms. Joseph failed to submit timely requests as required. She also failed to conduct and report on pupil vision and hearing screening. Many of the deficiencies for which Ms. Joseph was cited are deficiencies that did not exist in other schools in the district.

In his letter of June 20th, 1988, Casey noted his concern that student reading scores had fallen. He indicated that in the previous year 41.2 percent of the students who were tested performed the 50th national percentile or higher. However, for the '87-'88 school year, the first of Ms. Joseph's service as principal, the preliminary review of the test results indicated that only 33.3 percent of the students tested performed at or above the 50th national percentile.

(Tr. 518–19.) These criticisms resulted in Casey's giving Joseph a rating of "doubtful." (Tr. 520.) Joseph appealed; the rating was affirmed by the Chancellor.

As to the second probationary year, 1988–1989, the court found that Joseph "continued to exhibit deficiencies in her supervisory performance" (Tr. 520), necessitating the placement of additional letters of criticism in her file for inadequacies that included the following:

Failure to timely submit her response to the special education monitor's documentation report of June 20th, 1988. . . . [Citing Defendant's Exhibit 11.]

She also failed to timely submit the school's mainstream plan. . . . [Citing Defendant's Exhibit 13.]

She failed to timely submit a copy of her annual performance objectives for the '88–'89 school year . . . [citing Defendant's Exhibit 18].

She failed to submit vision and hearing screening reports for the '87 to '88 and '88 [to] '89 school year . . . [citing Defendant's Exhibits 19 and 29].

She failed to timely submit the principal's rating report of custodial services . . . [citing Defendant's Exhibits 14, 17, 21, and 29].

She submitted an unsatisfactory and not acceptable CSIP plan . . . [citing Defendant's Exhibits 25 and 27].

She submitted a grossly inadequate safety plan that was deficient in all seven categories except for establishing a chain of command . . . [citing Defendant's Exhibit 28].

She failed to meet the requirements of the Chancellor and Commissioner of Education with respect to teacher observation reports . . . [citing Defendant's Exhibit 31].

She exhibited a lack of administrative support for a very important health program, . . . and also exhibited problems collecting daily attendance data for [an] anti-truancy project.

She continued her failure to meet expectations in reading proficiency and the increased number of student suspensions, despite the presence of a dean, a guidance counselor and full-time pull-out teacher, further reflected badly on the discipline problem in the school.

In some respects, for example, with regard to performance objectives and the hearing reports and the rating of custodial services, Casey did not have to write to any other principal in the district regarding failure to perform those administrative duties.

(Tr. 520–22.)

The court also noted that Joseph had failed to participate properly in the hiring of an assistant principal for PS 27. School principals were expected to be involved in the initial screening and candidate-development process. However, when Casey contacted Joseph "to determine if there were any candidates she wanted added to the list for the initial screening[, h]e learned that she wasn't familiar with the list of applicants and hadn't discussed the issue with the PTA." (Tr. 524.) Further criticism of Joseph with respect to the selection of an assistant principal was lodged with Casey by the United Federation of Teachers. The union complained that, despite objections, Joseph had inappropriately permitted material endorsing one candidacy to be circulated by teachers during the school day.

In addition, the court referred to an incident that led to further criticism of Joseph by Casey. At a public community school board meeting, a PS 27 teacher read a letter from the Comprehensive School Improvement Program ("CSIP") Committee accusing Casey and District 15 of giving PS 27 inadequate support. Joseph, a CSIP Committee member, had not participated in the writing of the letter; but when the letter was read at the meeting, she sat mute. Casey viewed her conduct as unprofessional because it tacitly endorsed the criticisms despite the fact that, in Casey's view, they should have

been rebutted by citing examples of District 15's efforts. The district court found that, regardless of whether Casey was correct as a matter of substance, this incident epitomized "a serious administrative deficiency that the evidence overwhelmingly established to be present at PS 27, to be present in Ms. Joseph":

> [I]f she or the people at PS 27 in fact perceived inadequacies on the part of District 15 in dealing with PS 27 and its needs, it was her job to deal with the district and to address those inadequacies to her supervisor, the superintendent. She didn't do that. None of the complaints in the CSIP letter that was read in that public meeting had been brought to the attention of the superintendent. Her inability to deal within the administrative process established by the Board of Education reflected significantly and adversely on her ability to be an administrator within PS 27.

(Tr. 525–26.)

The court noted that Joseph received a negative evaluation for the year, in a report that set forth the reasons as follows:

> Reason number 1, failure to provide for the safety and welfare of children as evidenced by your lack of attention and/or adherence in a timely fashion to chancellor's regulations and district requirements to the following areas; school safety plan, discipline code/plan, pupil vision and hearing screening.
>
> Reason number 2, failure to plan for instructional and school programs by lack of your attention, compliance to district and central board requirements for the following areas. Chapter 1/PCEN programs, special education monitor's report, school mainstream plan.
>
> Reason number 3, failure to achieve effectiveness in ... administrative functioning of school as evidenced by your lack of attention and support and/or adherence to district requirements for the following areas [health service and attendance improvement programs].

Reason number 4, failure to meet required professional and supervisory responsibilities as evidenced by your disregard for required observation reports, custodial ratings, timely submission of annual performance objectives, submission of an acceptable CSIP plan.

Reason number 5, failure to provide professional leadership as evidenced by your inappropriate role during the assistant principal selection process and CSIP Committee process.

(Tr. 526–27.) The court stated, "I find those reasons set forth in this . . . pedagogical supervisory personnel report were both the actual beliefs of the superintendent and that they were held in good faith." (Tr. 527.)

As to Joseph's third year of probation, 1989–1990, the court found that the "administrative function of PS 27 showed some improvement," but that this was "due, in significant part, to the appointment of the assistant principal." (Tr. 527.) At the end of the third year, the parties agreed that Joseph's probation would be extended for one year.

In the fourth year, 1990–1991, however, the court found that Joseph again had exhibited administrative deficiencies:

During the 1990 to '91 school year, Ms. Joseph's administrative and supervisory performance continued to exhibit deficiencies resulting in additional letters being placed in her file. For example, the annual school inventory report was not timely filed. By February of '91 she had filed only six professional performance reviews and by June 21st of '91, she had filed only 27, failing to meet the requirements.

The safety plan was found to be deficient in three of seven categories. There were violations in the lunch program performance standards. The Lutheran Medical Center had discontinued its health program because she failed adequately to support it. In his letter of June 18th, 1991, which is Defendant's Exhibit 50, Casey summarized Ms. Jo-

seph's continued difficulty in achieving effectiveness in administrative functioning, in the administrative functioning of PS 27.

. . . .

During the time Ms. Joseph was principal of PS 27, it was the lowest performing school in the district in both reading and math. During that period of the approximately 620 elementary schools in the city, PS 27 ranked between 600 and 610.

(Tr. 529–30.) Casey thus rated Joseph as unsatisfactory, giving as his reasons

her failure to adequately address continued poor pupil achievement, particularly in the areas of reading and mathematics, failure to achieve effectiveness in the administrative functioning of the school and in responses to district and central board requests; failure to address pupil and community needs as evidenced by a lack of support for a school-based health service program and a failure to achieve the minimum standard of pupil attendance.

(Tr. 531.)

After reviewing the pertinent legal principles as to the shifting burdens of production in a Title VII case, the court concluded as follows:

Although the McDonnell Douglas test shifts the burden of production to the defendant, the ultimate burden of persuading the tr[i]er of fact, in this case me, that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. The question becomes whether the plaintiff has shown by a preponderance of the evidence that the defendant is liable for the alleged discriminatory conduct. Here, I've been provided with ample and in my respectful judgment, overwhelming evidence of a nondiscriminatory reason for the denial of tenure to Ms. Joseph. In fact, there are a number of reasons that have been presented to me. The overarching description of those is a failure

on her part to adequately preside as an administrator over PS 27. . . .

(Tr. 541.)

We see no error in the district court's application of the legal principles; nor do we see any clear error in the court's thorough findings of fact.

Joseph does not argue that any of the above findings are clearly erroneous; rather she contends that the district court did not properly take into account her evidence and arguments, such as (a) evidence that Casey based his decision to deny Joseph tenure in part on a flawed analysis of PS 27 test scores, (b) the argument that Joseph's failure as PS 27 principal was virtually guaranteed by the lack of support given that school by District 15, (c) Joseph's testimony that Casey had made or tolerated racially discriminatory remarks, and (d) the contention that racial discrimination should be inferred from the fact that a white principal in District 15, Ms. Goodman, whose school also had low math and reading scores, was not denied tenure. The record, however, belies any notion that the court failed to consider these matters. For example, the court addressed the flawed test-score analysis and found that Casey was shortly furnished a more accurate analysis and that, given the breadth of the information on which his tenure decision was based, his decision would not have been different had he had the more accurate analysis earlier:

> I credit the testimony of Mr. Casey that he relied on a wide variety of factors in making his adverse employment decision with regard to the plaintiff.
>
> He considered her performance over the entire four year probationary period and the achievement skills in reading and math over that entire period. He considered her ability to do the job as principal, to perform the administrative function required of a principal.

(Tr. 533.) As to the suggestion that District 15 denied PS 27 support, the court found, for example, that

District 15 provided ample support to PS 27 during the '87 to '88 school year. It was one of four schools in the district that received funds for Project Child, one of about a half dozen schools in the district that received funds under the Right to Read Program, one of two schools in the district that received funds for after-school and tutorial programs, the only elementary school in the district that was given a guidance dean position.

(Tr. 520.)

As to Joseph's testimony that Casey had made or tolerated racially offensive remarks, such as that "Joseph, of all people, ought to be able to get along with the parents of the PS 27 students" (Tr. 536), the court stated, "I cannot find in the context of the entire case that these statements either independently or in the aggregate evidence a racial animus" (*id.*). The court also noted that

> [d]uring Casey's tenure as Superintendent of District 15, the district actively recruited minority supervisors . . . referring to principals and assistant principals. These efforts bore fruit. During that period the percentage of minority supervisors in the district doubled from 20 percent to 40 percent. During Casey's 10 years as superintendent, he gave unsatisfactory ratings to only three principals. One of them, of course, was Ms. Joseph. The other two were white . . . supervisors.

(Tr. 535.) As to Joseph's contention that racial discrimination should have been inferred from the failure to deny tenure to Goodman, the court was unpersuaded:

> There has been some evidence presented to me of test results in Ms. Goodman's school but I'm persuaded that the evaluation of administrators in the public schools within District 15 was based on a far broader array of factors; that there were many parameters in the evaluation process and I'm not persuaded that before me are two similarly performing principals; that is, Ms. Good-

man and Ms. Joseph. So ... I ascribe no weight to the fact that Ms. Goodman was not denied tenure or that her file does not reflect lesser forms of administrative sanction.

(Tr. 539.) We reject Joseph's contention that, because the Board of Education failed to produce a more extensive personnel file on Goodman, the district court's evaluation of the evidence as to Goodman was impermissible. Prior to trial, the Board represented to the court that it had searched for all evaluations of District 15 principals for the period 1987 through 1991 and that it had produced all it could find. At trial, the Board produced Goodman's file for the court's review *in camera*. It was well within the discretion of the court to conclude that the Board had proceeded in good faith and to reject Joseph's contention that the sparseness of Goodman's file compelled an inference that Goodman was favored, and Joseph disfavored, on the basis of race.

In sum, the weight to be accorded the evidence, like the evaluation of the credibility of the witnesses, lay solely within the province of the district court as trier of fact. We have seen nothing in the record to suggest that the court's findings were clearly erroneous.

## CONCLUSION

We have considered all of Joseph's contentions on this appeal and have found them to be without merit. The judgment of the district court is affirmed.