Felix Norbert SIEWE, Petitioner,

v.

Alberto R. GONZALES, Attorney
General, Respondent.

Docket No. 05–6563–ag.

United States Court of Appeals,
Second Circuit.

Submitted: Nov. 29, 2006.

Decided: March 13, 2007.

Glenn T. Terk, Wethersfield, CT, for Petitioner.

Jenny L. Smith, Assistant United States Attorney (Alice H. Martin, United States

Attorney for the Northern District of Alabama, on the brief), United States Attorney's Office for the Northern District of Alabama, Birmingham, AL, for Respondent.

Before JACOBS, Chief Judge,
WALKER and RAGGI, Circuit Judges.

JACOBS, Chief Judge.

Petitioner Felix Norbert Siewe, a native and citizen of the Republic of Cameroon, seeks review of a November 17, 2005 order of the Board of Immigration Appeals ("BIA") affirming (without opinion) the January 15, 2004 decision of immigration judge ("IJ") Michael W. Straus, which denied Siewe's application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). *In re Siewe, Felix Norbert,* No. A96 266 945 (B.I.A. Nov. 17, 2005), *aff'g* A96 266 945 (Immig. Ct. N.Y. City Jan. 15, 2004). Siewe claims that the IJ's adverse credibility finding is not supported by substantial evidence because the IJ "erroneously resorted to speculation and conjecture when assessing the evidence," and because any inconsistencies relied upon by the IJ are "immaterial and easily and reasonably explained." We conclude that the IJ's incredulity was supportable by Siewe's submission of a suspect document, and that the IJ's finding that an arrest warrant was inauthentic rested on permissible inferences rather than bald speculation. Since the IJ's decision is thus supported by substantial evidence, the petition is denied.

## I

### A. *Asylum Application (May 2003)*

In May 2003, Siewe applied for asylum, withholding of removal, and relief under CAT. His application stated that he was born in May 1964 in Cameroon; that his wife and two children continue to live in Cameroon; and that he was subjected to political persecution by reason of his affiliation with Cameroon's largest opposition party, the Social Democratic Front ("SDF"), which is led by John Fru Ndi. The claimed particulars were:

(i) Siewe joined the SDF in 1990, was in charge of "socio-cultural activities" from 1995–2000, and served as "Secretary in Charge of Organization and Coordination" from 2001–2002;

(ii) in the 2002 elections, Siewe was campaign manager for an SDF candidate for the national assembly, Jean–Michel Nintcheu;

(iii) Siewe was arrested on June 28, 2002 (two days before Cameroon's national elections) in order "to prevent the story of the election frauds from coming out," and subsequently "detained in various cells" without charge for ten weeks, during which time he was fed only twice, beaten, and tortured; and

(iv) he will be arrested, tortured or executed if he returns to Cameroon because he has information about "massive fraud in the [2002] elections."

### B. *Asylum Officer Interview (June 2003)*

An asylum officer interviewed Siewe in June 2003, and concluded that Siewe was not credible primarily because dates given for important events were inconsistent.

According to the asylum officer's typed report, Siewe claimed: that he was named Nintcheu's campaign manager at the beginning of June 2002 for elections then scheduled for June 23, 2002; that two days before election day (on June 21), he joined many SDF members outside a government office, where they protested that they had not yet received voting cards required for balloting; that on the morning of election day the government postponed the elections for one week, to June 30, 2002; that

he returned to the government office on June 26, 2002 and threatened an election boycott unless the voting cards were timely issued; that he was arrested leaving work the next afternoon, taken to the judicial police office, transferred that night to another prison, and held there in the same cell for ten weeks; and that he was finally released outside a hospital when "he became ill."

To evidence his appointment as Nintcheu's campaign manager, Siewe presented a letter, which was dated June 5, 2002, and which, as the asylum officer observed, listed the date of the elections as *June 30.* As of the June 5 date of the letter, however, the election was scheduled for *June 23,* as Siewe stated and as evidenced by the State Department's 2002 Cameroon Country Report. It was not until "after the opening of the polls on June 23," that the election was postponed to June 30. Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, Cameroon: Country Reports on Human Rights Practices—2002 (2003), *available at* http://www.state.gov/g/drl/rls/hrrpt/2002/18172.htm (last accessed Mar. 9, 2007). The asylum officer therefore found "[t]he validity of this document ... highly suspect" and decided that Siewe failed to sustain his burden of establishing that he is a refugee.

The asylum officer expressed other doubts as well: Siewe's application said he was detained in "various cells and prisons" after he was taken to the police station, yet Siewe stated in his interview that he remained in one cell throughout his ten-week detention; the protests in which Siewe claimed to have participated were unreported in the press; and Siewe claimed that he left Cameroon on a passport in his own name notwithstanding a pending warrant for his arrest.

## C.  *IJ Hearing (January 2004)*

At the hearing conducted by the IJ, Siewe (represented by counsel) generally repeated the accounts given earlier, with some elaboration, some explanation for inconsistency, and some additional documentary evidence.

Siewe testified that after his arrest he was beaten at the Douala police station, and then held ·at another prison for ten weeks in a single cell with twenty other prisoners, where they slept on the floor, used buckets for toilets, were fed only twice ("three or four pieces of bread"), and were beaten with belts on the chest and wooden sticks on the legs and feet; Siewe stated that one prisoner died. Siewe testified that he was never charged or permitted to see a lawyer; that he was left for dead in front of a hospital in Douala where he was treated for two weeks; that when he left the hospital, he hid with his brother in a suburb of Douala, during which time (Siewe's wife told his brother) the police came looking for him and killed his dog; and that he twice returned to work so that he could seek and get a "vacation letter," which he used to obtain a U.S. visa.

Siewe acknowledged that his asylum application omitted some of the events and facts to which he had just testified, including being left for dead at the hospital, and the visit by police who killed his dog, but explained that after starting to give a detailed account in his application, he was forced to abbreviate things to reduce the cost of translation. When asked why he omitted these events and facts when he was interviewed by the asylum officer, Siewe testified that the asylum officer "wouldn't let me answer except to the question that he was asking." Also, he asserted that he told the asylum officer that he was left for dead when he was dropped at the hospital, and could not understand why the officer only wrote that

"he became ill." As to certain of the inconsistencies observed by the asylum officer—detention in various cells rather than one, and membership in the SDF since 1990 rather than 1995—Siewe blamed the interpreter who assisted with the asylum application.

Siewe was cross-examined—and questioned by the IJ—about various inconsistencies in the documentary evidence. Siewe submitted a photocopy of the arrest warrant that he claimed was posted at his house after he left the hospital. Siewe testified that he forgot to keep the original, and that he carried the photocopy with him when he left the country (supposedly as a fugitive) because his wife's friend was a police inspector at the airport and "facilitate[d]" his departure from Cameroon. Siewe did not know why the warrant, which purported to have been signed by the Commander of the National Police, would acknowledge the existence of "political police": "Frankly, a lot of things are done at the local police level without the acceptance or acknowledgment of the higher ups in government." Nor could he explain why the warrant stated that he had five children, when Siewe testified that he had two.

Siewe also submitted two letters purporting to have been signed by a local SDF president, one Tchamambe: the first attested to Siewe's party membership, and the other helpfully recited that Siewe "found himself obliged to disappear for an unknown destination after the elections on June 30, 2002, as a result of persecution, physical torture and detention during which he was abused." The IJ confronted Siewe with a publication by the British Foreign Office that states: "The SDF is aware that some Cameroonian asylum applicants have submitted letters and documents purporting to have been issued by the SDF in support of their applications for asylum. The SDF have stated that such letters of support could only be issued by the Chairman of the SDF, John Fru Ndi." Siewe explained that the local president "hesitated," but that Siewe "begged him ... to sign it" because the letters "wouldn't have made it here in time" if they had to be signed by Chairman Ndi. Siewe added that, because the local president was not authorized to send such letters, he refused to send Siewe the original version of the letter, and only sent a copy.

Siewe submitted a medical certificate dated September 12, 2002—two days after he was purportedly admitted to the hospital—stating that Siewe "claimed that he was a victim of police brutality," and documenting "[m]ultiple contusions, [a] painful tumefaction of the soles of the feet [and a] penetrating wound in the Sternal region of the chest." Siewe testified that he awoke in the hospital on September 12, and immediately asked for the document in order to present it to a human rights organization. When asked why the certificate did not mention that he was malnourished—he testified to receiving food only twice during his ten-week detention—Siewe testified that this was "a minor detail" which he did not share with his doctor.

Siewe was not asked why the June 5th letter appointing him Nintcheu's campaign director, which purported to have been written at a time when the elections were scheduled for June 23, stated that the elections were scheduled for June 30.

### D. *IJ Decision*

In an oral decision, the IJ found that Siewe's evidence and testimony were not to be believed. Based upon this adverse credibility finding, the IJ found: that Siewe was ineligible for asylum because he failed to establish past persecution or a reasonable possibility of future persecution

if he returns to Cameroon; that Siewe thus necessarily failed to demonstrate a clear probability of persecution, making him ineligible for withholding of removal; and that Siewe could not prove either past torture or a probability of torture if he returned to Cameroon, and thus was ineligible for CAT relief.

On February 13, 2004, Siewe appealed the IJ's decision to the BIA. On November 17, 2005, the BIA affirmed, without opinion. Siewe appealed to this Court on December 14, 2005.

# II

On appeal, Siewe attacks some of the fact-finding on which the adverse credibility finding rests. Among other things, Siewe attacks as mere "speculation and conjecture" the finding that the arrest warrant was inauthentic, an argument that misses the difference between speculation and inference. *See* Point IV, *infra.* Siewe does not meaningfully challenge certain other of the IJ's findings, including the finding that the letter appointing him campaign manager was fraudulent—a finding that subverts Siewe's credibility in other respects. *See* Point V, *infra.*

Siewe advances the following challenges to the following factual findings:

(a) The IJ concluded that Siewe's photocopied arrest warrant was inauthentic because: (i) the IJ disbelieved Siewe's explanation for obtaining only a copy of the arrest warrant, and not the original; (ii) the warrant incorrectly stated the number of Siewe's children; (iii) an authentic arrest warrant signed by the commander of the national police likely would not acknowledge the existence of "political police" or "political prisoners"; and (iv) the undoubted existence of corruption in Cameroon did not suffice to support Siewe's account that he was able to leave Cameroon in his own name carrying his own arrest warrant because his wife bribed an airport official. Siewe challenges this finding of inauthenticity, claiming that the IJ engaged in "mere conjecture and speculation."

(b) The IJ did not credit Siewe's explanations for omitting various events from his asylum application and asylum officer interview. The IJ deemed significant Siewe's participation in the June 27, 2002 violence because it "apparently gave rise to his arrest." Siewe asserts that this omission should be discounted because he did not testify that his involvement led to his arrest, but rather that he was arrested because he advocated a boycott of the elections. The IJ also doubted Siewe's testimony that while he was in hiding, the police visited his home and killed his dog, because Siewe did not mention the incident in his application interview. Siewe argues on appeal that he considered this event to be relatively insignificant.

(c) The IJ concluded that the two letters purporting to be from the local SDF president—the first attesting to Siewe's membership in the SDF, and the second to his claimed persecution—were inauthentic because: (i) SDF rules only allow Chairman Ndi to sign such letters; (ii) the second letter stated that Siewe disappeared after the elections, which was inconsistent with his testimony that he was arrested three days before those elections; and (iii) Siewe's submission of the fraudulent SDF letter purporting to appoint him Nintcheu's campaign manager (*see* discussion *infra*), tainted the authenticity of the two other SDF letters. Siewe argues that the IJ should have credited his explanation— that the local SDF president hesitated but eventually agreed to send the letters after Siewe begged—and that any discrepancy was minor.

(d) The IJ doubted Siewe's testimony that he was left for dead outside the hospital after ten weeks imprisonment because it was inconsistent with his statement to the asylum officer that he was released after "he became ill," and because it was inconsistent with his application, which does not mention his release at all. Siewe claims that these inconsistencies are "collateral to the central basis of [his] claim" and resulted from mistranslation.

(e) The IJ found that the medical report was fraudulent because it did not mention that Siewe was malnourished, as he must have been after being starved for ten weeks. Siewe mis-characterizes the IJ's finding as only criticizing the absence of a "complete medical record"; and responds to the IJ's skepticism about Siewe's request for a medical report as soon as he emerged from a coma, by citing his explanation that he asked the doctor to prepare a document for presentation to a human rights organization. Siewe therefore effectively leaves unchallenged, the IJ's finding that the absence of reference to Siewe's stated condition renders the medical report suspect.

(f) The IJ concluded that the letter purporting to appoint Siewe as Nintcheu's campaign manager was fraudulent, reasoning that "on June 5, 2002, the elections were scheduled to be held on June 23rd of 2002. The Court therefore finds that this does not appear to be a valid document [as] the elections were not postponed [to the 30th] until the last minute." Siewe argues, without any apparent basis, that the IJ rejected the letter because it appointed Siewe less than three weeks before the elections were scheduled. That is plainly not the reason given by the IJ. And thus Siewe does not meaningfully challenge the IJ's finding.

## III

When, as here, the BIA affirms without opinion pursuant to 8 C.F.R. § 1003.1(e)(4), we review the IJ's decision directly. *Jian Hui Shao v. B.I.A.*, 465 F.3d 497, 500 (2d Cir.2006); *see, e.g., Li Hua Lin v. U.S. Dep't of Justice*, 453 F.3d 99, 105 n. 5 (2d Cir.2006). We review the IJ's factual findings under the substantial evidence standard—the "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Zhou Yun Zhang v. I.N.S.*, 386 F.3d 66, 73 n. 7 (2d Cir.2004).

■ "When a factual challenge pertains to a credibility finding ... we afford particular deference in applying the substantial evidence standard, mindful that the law must entrust some official with responsibility to hear an applicant's asylum claim, and the IJ has the unique advantage among all officials involved in the process of having heard directly from the applicant." *Zhang*, 386 F.3d at 73 (internal quotation marks omitted). The fact that an IJ "has relied primarily on credibility grounds in dismissing an ... application cannot insulate the decision from review." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir.2004). But our "exceedingly narrow" review of a credibility finding, *Melgar de Torres v. Reno*, 191 F.3d 307, 313 (2d Cir.1999), ensures only that it is "based upon neither a misstatement of the facts in the record nor bald speculation or caprice." *Zhang*, 386 F.3d at 74; *see also Secaida–Rosales v. I.N.S.*, 331 F.3d 297, 307 (2d Cir.2003) (stating that an adverse credibility finding must be based on "specific, cogent reasons" that "bear a legitimate nexus" to the applicant's credibility (internal citations and quotation marks omitted)).

■ Even when an IJ's decision contains errors, "we may nevertheless deem

remand futile and deny the petition for review if '(1) substantial evidence in the record relied on by the IJ, considered in the aggregate, supports the IJ's finding that petitioner lacked credibility, and (2) disregarding those aspects of the IJ's reasoning that are tainted by error, we can state with confidence that the IJ would adhere to his decision were the petition remanded.'" *Singh v. B.I.A.*, 438 F.3d 145, 147–48 (2d Cir.2006) (*per curiam*) (quoting *Xiao Ji Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 161 (2d Cir.2006)).

## IV

As to the authenticity of his arrest warrant, Siewe's argument that the IJ's findings are "based upon mere conjecture and speculation" elides the distinction between fair inference and bald speculation.

Drawing inferences from direct and circumstantial evidence is a routine and necessary task of any factfinder. "The very essence of [the factfinder's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable." *Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944). "Decisions as to . . . which of competing inferences to draw are entirely within the province of the trier of fact." *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 44 (2d Cir.2000) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 573–75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). In the immigration context, the IJ is the factfinder to whom this indispensable work is delegated. *Zhang*, 386 F.3d at 73.

As the Supreme Court has observed, the drawing of a fair inference inevitably entails some measure of speculation. "Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference." *Lavender v. Kurn*, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916 (1946). Thus the Court ruled that speculation and conjecture become legally impermissible "[o]nly when there is a complete absence of probative facts to support the conclusion reached." *Id.* It further cautioned that "the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." *Id.*

■ Although *Lavender* involved a speculation challenge to a jury verdict, the Court articulated these principles categorically. Thus, we conclude that *Lavender's* principles apply to our review of administrative findings of fact, just as they support and explain the "great deference" this Court accords to a district court's resolution of competing inferences after a civil bench trial. See *Sweeney v. Research Found. of State Univ. of N.Y.*, 711 F.2d 1179, 1185 (2d Cir.1983); see also *Chen v. Bd. of Immigration Appeals*, 435 F.3d 141, 145 (2d Cir.2006) (drawing analogy between review of immigration findings and findings at bench trial and noting that, in latter context, "we have been authoritatively instructed to uphold a finding unless we are 'left with the definite and firm conviction that a mistake has been committed,'") (quoting *Inwood Laboratories, Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574, 105 S.Ct. 1504. Rather, a reviewing court must defer to that choice so long as the deductions are not "illogical or implausible." *Id.* at 577,

105 S.Ct. 1504; *accord Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 618 (2d Cir.1991) ("[W]here the evidence would support either of competing inferences, the fact that this Court might have drawn one inference does not entitle it to overturn the trial court's choice of the other."). A corollary is that record support for a contrary inference—even one more plausible or more natural—does not suggest error. *See Joseph v. N.Y. City Bd. of Educ.*, 171 F.3d 87, 93 (2d Cir.1999); *Healey*, 947 F.2d at 619.

▪ A district court's findings of fact are reviewed for "clear error," *United States v. Coppola*, 85 F.3d 1015, 1019 (2d Cir.1996) (citing Fed.R.Civ.P. 52(a)), and an IJ's findings are reviewed for "substantial evidence." *Secaida–Rosales*, 331 F.3d at 306–07. These standards of review bespeak no lesser deference to an IJ than to a district judge when each draws inferences from the evidence as a finder of fact.[1] So long as there is a basis in the evidence for a challenged inference, we do not question whether a different inference was available or more likely.

▪ As this Court has recognized, "the line between reasonable inference-drawing and impermissible speculation is necessarily imprecise," *Huang v. Gonzales*, 453 F.3d 142, 147 (2d Cir.2006); *see also Chen*, 435 F.3d at 145—as is perhaps to be expected, given that some measure of speculation may be necessary in drawing an inference, *see Lavender*, 327 U.S. at 653, 66 S.Ct. 740. " '[A]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist].' " *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (quoting 1 Leonard B. Sand et al., *Modern Federal Jury Instructions* ¶ 6.01, instr. 6–1 (1997)) (alterations in original). Accordingly, we will reject a deduction made by an IJ only when there is a complete absence of probative facts to support it—that is, when the speculation is "bald." *Zhang*, 386 F.3d at 74.[2] The speculation that inheres in inference is not "bald" if

---

1. In *dicta*, and without analysis, this Court has said that "[s]ubstantial evidence review in the immigration context is 'slightly stricter' than the clear-error standard that the circuit courts typically apply in reviewing a district court's factual findings." *Qiu v. Ashcroft*, 329 F.3d 140, 149 (2d Cir.2003). However, the Ninth Circuit case cited and quoted in *Qiu* as sole support for that proposition, *Aruta v. I.N.S.*, 80 F.3d 1389, 1393 (9th Cir.1996), in turn cites without analysis to *Shirazi–Parsa v. I.N.S.*, 14 F.3d 1424, 1427 (9th Cir.1994), which in turn cites without analysis to *Rodriguez–Rivera v. I.N.S.*, 848 F.2d 998, 1001 (9th Cir.1988), which in turn cites without analysis to *Diaz–Escobar v. I.N.S.*, 782 F.2d 1488, 1492 (9th Cir.1986), which in turn cites without analysis to *Bolanos–Hernandez v. I.N.S.*, 767 F.2d 1277, 1282 n. 8 (9th Cir.1984). But *Bolanos–Hernandez* gives no support to the proposition; the passage cited states only that, after passage of the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (codified in scattered sections of 8 U.S.C. (1982)), withholding of removal was no longer discretionary, so abuse-of-discretion review had been replaced by "a heightened, substantial evidence standard of review." *Id.* at 1282 n. 8.

2. We have also rejected deductions that were plainly infected by evident discrimination. *See Huang*, 453 F.3d at 147–50 (concluding that "IJ's speculation" was influenced by "evident bias" against witnesses who were Chinese); *cf. Zhi Wei Pang v. Bureau of Citizenship & Immigration Servs.*, 448 F.3d 102, 117 (2d Cir.2006) (Raggi, J., concurring in part and concurring in the judgment) (observing that we would not defer to fact finding by IJ who "refuse[d] to believe evidence offered on Tuesdays or through witnesses whose names end in vowels"). On the other hand, some decisions of this Court have accepted inferences of implausibility based simply on "inherently improbable testimony." *See Ming Xia Chen v. Board of Immigration Appeals*, 435 F.3d 141, 145 (2d Cir.2006).

the inference is made available to the fact-finder by record facts, or even a single fact, viewed in the light of common sense and ordinary experience. So long as an inferential leap is tethered to the evidentiary record, we will accord deference to the finding. *Cf. Cao He Lin v. U.S. Dep't of Justice,* 428 F.3d 391, 405 (2d Cir.2005) ("Without some specific evidence concerning practices in China, the IJ's conclusion . . . is speculative.").[3]

■■■ The IJ's finding concerning the authenticity of Siewe's arrest warrant is based on record-supported facts and inferences.

(i) Siewe testified that he acquired the arrest warrant from a friend who found it hanging on Siewe's garage door, and that Siewe had only a copy because the original was creased; the skeptical IJ observed that the copy shows no evidence of having been creased. A photocopy of a creased document may of course show a crease, or not; but the absence of streaking on the copy is evidence tending to support an inference that the original was undamaged.

(ii) Siewe could not explain why the warrant stated that he had five children, when he testified that he only had two. The warrant could of course be wrong: an authentic warrant is unlikely to have been prepared with Siewe's input. But errors in the document support an inference that the document is not official or is an altered copy of another warrant prepared for the arrest of someone else.

(iii) The arrest warrant, signed by the commander of the national police, expressly acknowledges the existence of "political police." The IJ considered this unlikely, and rejected Siewe's expla-nation that the warrant's use of the term " 'political police' was a result of careless language and the fact that [the Cameroonian authorities] were not overly concerned with how the phrase 'political police' on an arrest warrant would look to foreign observers." Siewe's explanation offers one plausible inference; but the IJ could and did draw a reasonable inference to the contrary. *See Majidi v. Gonzales,* 430 F.3d 77, 81 (2d Cir.2005) (stating that it is "emphatically not our role" to consider whether the petitioner's explanation, which the IJ had rejected, is more plausible than the record-supported inference the IJ had drawn).

(iv) Siewe testified that when he left Cameroon, he traveled in his own name carrying his own arrest warrant. The IJ considered this unlikely, and rejected Siewe's account that his wife had bribed an airport official to effect his unimpeded departure. The IJ found that corruption abounds in that country, and on that basis could have credited Siewe's account; but we can hardly conclude that he was "compelled" to do so, 8 U.S.C. § 1252(b)(4)(B). The IJ was free to discredit Siewe's account of how he escaped Cameroon with his arrest warrant and to infer from false testimony on that point that he had not produced an authentic warrant.

Accordingly, the IJ's rejection of Siewe's arrest warrant as inauthentic did not impermissibly rest on speculation that was bald.

**V**

Siewe presses challenges to a number of other findings that bear on credibility.

---

**3.** Of course, permissible inferences can, in appropriate circumstances, be drawn from a *lack* of record evidence, particularly against a party bearing the burden of proof on an issue where the evidence is available. *See Zhang,* 386 F.3d at 78 (and cases cited therein) (recognizing circumstances where lack of corroborative documentary evidence can support adverse credibility inference against asylum petitioners).

We reject them because Siewe does not meaningfully challenge the IJ's finding of inauthenticity as to the June 5th letter appointing him campaign manager—a document that he sponsored and that bears on a material matter. Having found that such a document was false, the IJ was free to deem suspect other documents (and to disbelieve other testimony) that depend for probative weight upon Siewe's veracity.

In support of his application, Siewe submitted a letter which on its face appoints him campaign director for Jean–Michele Nintcheu, an SDF candidate for Cameroon's national assembly. The letter, dated June 5, 2002, stated that the elections were to be held on June 30th. But—according to Siewe's own undisputed testimony as well as the State Department country report—as of June 5th, the elections were still scheduled for June 23rd. It was only after the polls opened on June 23rd that the elections were postponed to June 30th. As the IJ found, the letter cannot possibly be what it purports to be. And Siewe does not meaningfully contest the point.

■■■ We have "frequently ... held [that] an IJ's application of the maxim *falsus in uno, falsus in omnibus* [false in one thing, false in everything] may at times be appropriate." *Zhong v. U.S. Dep't of Justice,* 461 F.3d 101, 123 (2d Cir.2006). In the immigration context, corroborating evidence is often limited, and the petitioner's credibility is almost always crucial. So a single false document or a single instance of false testimony may (if attributable to the petitioner) infect the balance of the alien's uncorroborated or unauthenticated evidence. An IJ may, either expressly or impliedly, rely on *falsus in uno* to discredit evidence that does not benefit from corroboration or authentication independent of the petitioner's *own* credibility. *Falsus in uno* may also influ-

ence the IJ's assessment of the credibility of the corroborative evidence itself. In other words, a finding of fraudulent evidence redounds upon all evidence the probative force of which relies in any part on the credibility of the petitioner. And where an IJ's finding of fabrication (supported by substantial evidence) serves as the basis for discrediting other evidence, a reviewing court is in no position to conclude that the discrediting of the remaining evidence is unsupported by substantial evidence.

■■■ However, there are limitations to the invocation of *falsus in uno;* they generally fall into five categories:

(i) A finding that the petitioner adduced false evidence does not excuse the assessment of evidence that is independently corroborated. *See Poradisova v. Gonzales,* 420 F.3d 70, 77 (2d Cir.2005) ("Despite our generally deferential review of IJ and BIA opinions, we require a certain minimum level of analysis from the IJ and BIA opinions denying asylum, and indeed must require such if judicial review is to be meaningful.").

(ii) The presentation of fraudulent documents that were created to *escape* persecution may actually tend to support an alien's application. *See Lin v. Gonzales,* 445 F.3d 127, 132–33 (2d Cir.2006). This includes, for example, a false sterilization certificate submitted to Chinese authorities to evade actual sterilization, or false travel documents created to escape a country of alleged persecution. *Id.* But this does not include false documents submitted as genuine to the IJ or BIA.

(iii) False evidence that is wholly ancillary to the alien's claim may, in some circumstances, be insufficient by itself to warrant a conclusion that the entirety of the alien's uncorroborated material evidence is also false. *See Zhong,* 461 F.3d

at 123. But because the submission of such evidence naturally raises the question of the alien's overall credibility, even ancillary evidence sometimes supports *falsus in uno.* *See generally Zhi Wei Pang,* 448 F.3d at 119 (Raggi, J., concurring in part and concurring in the judgment) (observing that ancillary evidence may be cited to reinforce adverse credibility ruling otherwise supported by material discrepancies or implausibilities).

(iv) A false statement made during an airport interview, depending on the circumstances, may not be a sufficient ground for invoking *falsus in uno.* Aliens may "not be entirely forthcoming" during the initial interview due to their perception that it is "coercive" or "threatening," particularly aliens who may have a well-founded fear of government authorities in general. *Guan v. Gonzales,* 432 F.3d 391, 396 (2d Cir. 2005) (*per curiam* ) (internal quotation marks omitted) (emphasis omitted).

(v) An alien's submission of documentary evidence that the alien does not know, and has no reason to know, is inauthentic, is no basis for *falsus in uno.* For example, a document sent by a family member attesting to events occurring in the alien's native country after he left, might not bear on the alien's own credibility unless he knew or had reason to know of its falsity.

In these five circumstances, none of which apply here, it may be inappropriate for an IJ to reject an alien's uncorroborated evidence based solely upon the submission of false evidence.

The IJ did not *in haec verba* intone the Latin maxim, but no such recital is necessary. *Falsus in uno* is a natural and instinctive tool of the factfinder, like a carpenter's hammer or plumber's wrench. Here, the IJ found that the letter purporting to appoint Siewe as campaign director was "a fraudulent document," and accordingly rejected Siewe's explanations for other apparent inconsistencies and debated facts in his testimony. This finding, supported by substantial evidence, casts doubt on all of Siewe's uncorroborated evidence, and supports other inferences drawn by the IJ.

\* \* \*

For the foregoing reasons, substantial evidence supports the IJ's adverse credibility finding. Accordingly, the petition for review is denied. Having completed our review, the pending motion for a stay of removal in this petition is denied as moot.