RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0130p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JIANPING WANG,

         *Petitioner,*

  *v.*

LORETTA E. LYNCH, Attorney General,

         *Respondent.*

No. 14-4029

On Petition for Review of an Order of
the Board of Immigration Appeals.
No. A099 732 453—Memphis.
Decided and Filed:  May 27, 2016

Before:  SUHRHEINRICH, DAUGHTREY, and ROGERS, Circuit Judges.

---

**COUNSEL**

**ON BRIEF:**  Kathryn M. McKinney, UNITED STATE DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  Jian Ping Wang, San Gabriel, California, pro se.

---

**OPINION**

---

ROGERS, Circuit Judge.  An applicant for a government benefit such as asylum may understandably pattern the facts of his application on those asserted by other applicants in previously successful applications.  The tendency is doubtless stronger when the applicant is from a foreign culture where caution may be the watchword in giving personal information to the government, and especially where the applicant is not really sure what information our government is looking for.  Recognizing the strength of such temptation, an immigration judge may reasonably question the truthfulness of an asylum applicant whose story of persecution is

1

unbelievably similar to those of previously successful applicants. An immigration judge may properly take such remarkably similar facts as some evidence that an applicant is not telling the truth, at least where the applicant has been given a chance to explain the suspicious similarities. That is what happened in this case. On review of the immigration judge's denial of asylum based in large part on unlikely similarities with previous applications, the Board of Immigration Appeals properly upheld the denial of the asylum petition in this case.

Jianping Wang entered the United States in June 2006 as a nonimmigrant with authorization to remain until September 7, 2006. In November 2006, Wang appeared before an IJ, and after conceding removability, filed an application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). The Department of Homeland Security (DHS) argued among other things that Wang's asylum application was strikingly similar to several others. The IJ nonetheless determined that Wang's testimony was credible, and issued an oral decision granting Wang's application for asylum based upon his practice of Christianity. The IJ, stating that the similarities might have arisen from the applications' having been prepared by the same person, declined to consider the other applications. On appeal, the BIA reasoned that the IJ's credibility analysis was insufficient and failed to adequately address the DHS's argument regarding the similarities between Wang's application and the others. According to the BIA, the IJ also failed to adequately address the evidence in the record. The BIA remanded the case to the IJ for fuller consideration of the record and the DHS's argument.

The previous IJ having in the meantime been transferred, a new IJ was assigned the case on remand. The IJ pointed out that Wang's story contained many implausible elements, such as Wang's statement that he was placed under police surveillance but still managed to obtain a visa, which requires an interview. The IJ also noted the unlikelihood of Wang's being able to board a plane and leave China even though he was under governmental watch. Most damaging to Wang's credibility, however, were "two asylum applications from completely unrelated cases that share a striking number of very specific details."

The IJ noted as an initial matter that "all three statements attached to the asylum applications appear to use the same formatting including the same font type, font size, typeface, margins, spacing, headings and so forth." The IJ then turned to the substantive similarities:

[A]ll three narratives are very similar substantively. Two of the three respondents, including Respondent, were introduced to Christianity by a nurse who was caring for a friend or family member in a government run hospital. In these stories, the nurse prayed for and preached to the patients and respondents, who eventually felt that this faith and prayer was instrumental in the patients' recovery. The nurses then invited the respondents to worship at family churches and gave them bibles. In the third application, the respondent was introduced to Christianity by a friend who maintained good spirits despite a great deal of adversity in his life. This friend invited the respondent to a family church service.

In all three applications, the respondents attended family church services and were eventually baptized. In all three accounts, the respondents were at church services at a member's home at either 10 am or 10:30 am when three police officers arrived. In two of the accounts, the police officers ordered the worshippers to stand in the kitchen. In all of the stories, the police confiscated the bibles and other church materials. The worshippers were then loaded into a police vehicle and then taken to the local police station.

At the police station, all three respondents had very similar experiences. The respondents were all interrogated by the police. The police asked the respondents what their "anti-government purposes" were, and where the other family churches were located. The respondents answered that they had no "anti-government purposes" and did not know where the other churches were. The respondents were then either slapped or punched and then thrown on the ground, beaten with batons, and kicked in the stomach. All three interrogations allegedly lasted forty minutes. The respondents were then detained in small, dirty cells roughly "fifteen square meters" with about half a dozen other inmates at detention centers. In all three accounts, the respondents were either fed very little or their food was stolen by the other inmates.

All of the respondents were released from detention after their wives paid a bond of "RMB 8,000" so they could seek medical attention. All three respondents were placed on police surveillance and ordered to report to the police station once a week. The respondents were all hospitalized for 5–7 days, and terminated from their respective jobs. Due to the urging of friends and family members, the respondents made plans to come to the U.S. After their arrivals, all three were informed by their families that the police had come to their homes to search for them and that the police would punish the respondents severely if they were found.

These substantive similarities, according to the IJ, were "not as striking as the frequent occurrence of similar or identical language and phrasing across the applications":

All three applications have the same introductory paragraph stating "Because of attending Christian family church activities, I was persecuted by the

Chinese government. I was also arrested, detained, interrogated and beaten up by police, and was terminated from my public work . . . I had no choice but to escape from China. I hereby apply to the US Government for asylum." The three respondents also state in their applications, "I often joined their church activities" and that "I believe in God more and more."

> In all three cases, the police referred to the worshippers as members of a "devil cult." The police, during the interrogations, also asked what the respondents' "reactionary purpose" was. They were all placed in "dirty and stinky" cells. Upon release from the hospital, all three respondents "reported to the police station every week" and were terminated from their "public work" and were ordered to "write repenting letter as soon as possible (sic)."

> Finally, Respondent's statement says the police came to his wife's house and "they claimed that I was a devil cult member, if they caught me and would punish me severely. I would be persecuted severely if I go back to China now." Another statement is almost identical stating the police came to his house after he left, and "they claimed that I was a devil cult member, did not repent; they would punish me severely if they caught me. I will be persecuted severely if I go back to China now." All three respondents close their statements by saying, "Therefore, I apply to the US government for asylum. Please grant me (sic)."

The IJ proceeded to explain why Wang's explanations of these similarities were inadequate and why these similarities supported the IJ's finding of Wang's lack of credibility:

> This analysis is by no means an exhaustive enumeration of every similarity found across these three separate and unrelated asylum applications by applicants represented by different attorneys, and allegedly speaking through different translators . . . . There are many other similarities among the statements. The potential innocent explanations of these similarities discussed above do not square with the evidence . . . . The first two possibilities, that the different applicants inserted truthful information into standardized templates, and the similarities are the result of the same translator using their own rigid style, do not apply here, as all three applications were apparently prepared by different translators. Further, Respondent stated his translator was a friend of his from his Church in Los Angeles. The next possibility, that Respondent's application is the true account and the others are plagiarized, is not likely as Respondent stated that he did not tell his story to or share his statement with anyone other than Ms. Liu who translated the statement for him. Ms. Liu did not translate the other two statements. Finally, the last explanation, that the similarities resulted from faulty translation, is also speculation. . . . Moreover, faulty translation could not have resulted in the use of such specific identical wording as "devil cult" and "reactionary purpose" as well as entire paragraphs being same. Further, Respondent stated that he alone wrote his statement and that he did not use a snakehead or an attorney in preparing his original statement. Therefore, the Court

is left only with what is within the four corners of the record. The Court does not feel the need to reach the full conclusion that Respondent's entire asylum application is outrightly fraudulent. However, the Court cannot overlook these striking similarities and believes they reflect adversely on Respondent's credibility.

Based on the inherent implausibility of elements of his story, and the suspicious number of highly specific similarities between his application statement and two others submitted by DHS, the IJ found Wang not credible.

In doing so, the IJ relied upon the fact that Wang had been notified of the similarities and given an opportunity to explain them: DHS made the inter-application-similarity argument at the initial IJ hearing, and the similar applications were in the record and were the primary rationale for the BIA's remand decision. In addition to these implicit notifications, the IJ, on remand, notified Wang of the similarities and gave him an opportunity to respond to them.

Furthermore, the IJ analyzed letters and medical records that Wang submitted, and the IJ found this evidence to be insufficiently corroborative of Wang's claim. The IJ accordingly denied Wang's application for asylum. The IJ also determined that Wang failed to meet the more stringent standards for withholding of removal or protection under the CAT. The IJ thus denied all of Wang's requested relief and ordered Wang removed. On appeal, the BIA upheld the IJ's ruling. The BIA, in its order, in essence agreed with the IJ's findings. Regarding the credibility determination, the BIA affirmed the IJ's order based on the IJ's stated reasons. The BIA also repeated the IJ's findings on Wang's evidence and agreed with those findings.

Wang petitions this court for review and contends that the previous, unrelated applications "should have no bearing on this case." Wang argues that the similarities could have resulted from their being prepared by the same office and from the fact that thousands of Chinese asylum refugees allege religious persecution. However, the agency may consider for credibility purposes the close similarity of the asserted facts in unrelated asylum cases, as long as the agency meets the procedural requirements that the BIA has recognized. That is the case here.

The reasoning and holding of the Second Circuit in *Mei Chai Ye v. United States Department of Justice*, 489 F.3d 517 (2d Cir. 2007), and the framework subsequently laid out in

*Matter of R-K-K-*, 26 I. & N. Dec. 658 (BIA 2015), are persuasive in reaching this conclusion. In *Mei Chai Ye*, an asylum applicant submitted an affidavit that included twenty-three discrete instances of language, grammar, and order that were "strikingly similar" to an unrelated applicant's affidavits. 489 F.3d at 519–20, 522–23. In that case, the IJ notified the applicant of the similarities, expressed concerns to the applicant about the similarities, afforded the applicant opportunities to comment on these similarities, and allowed the applicant to offer evidence explaining the similarities. *Id.* at 525. The Second Circuit concluded that "[o]nce it became evident that Ye would not seek to take advantage of these numerous opportunities to explain, it became reasonable for [the] IJ . . . to draw the inference that the remarkable inter-proceeding similarities were evidence that Ye's asylum application was false." *Id.* The BIA, in *Matter of R-K-K-*, organized *Mei Chai Ye*'s reasoning into a three-step framework:

> First, the [IJ] should give the applicant meaningful notice of the similarities that are considered to be significant. Second, the [IJ] should give the applicant a reasonable opportunity to explain the similarities. Finally, the [IJ] should consider the totality of the circumstances in making a credibility determination. Each of these steps must be done on the record in a manner that will allow the [BIA] and any reviewing court to ensure that the procedures have been followed.

26 I. & N. Dec. at 661.

The First Circuit's decision in *Dehonzai v. Holder*, 650 F.3d 1 (1st Cir. 2011), supports this reasoning. In *Dehonzai*, an individual from the Ivory Coast sought asylum on the basis of political persecution. *Id.* at 2. Dehonzai's asylum application, however, replicated the application of his purported cousin. *Id.* at 4. In its review of the BIA's decision, the First Circuit stated that "[a] reasonable factfinder could find that Dehonzai's description of his mistreatment in the same words as [his cousin] was not creditworthy," and that Dehonzai was notified of and afforded opportunities to explain the similarities "on two different occasions." *Id.* at 8. The First Circuit upheld the BIA's finding that Dehonzai failed to adequately explain the similarities on those occasions. *Id.*

Wang was afforded sufficient procedural safeguards throughout the proceedings in the immigration courts, which squares this case with *Mei Chai Ye* and *Matter of R-K-K-*. DHS made the inter-application-similarities argument at the initial hearing and throughout the process of

appealing the IJ's initial ruling to the BIA. Furthermore, the similarities provided the predominant basis for the BIA's reversal of the IJ's initial ruling. On remand, the IJ notified Wang of the similarities and gave him an opportunity to explain them, but he did not. Wang cannot claim that his failure to explain the similarities resulted from a lack of notice or from a lack of other procedural safeguards.

Wang, on appeal, attempts to explain the similarities, but these explanations are without merit. Although Wang argues that the applications were prepared by the same office, the various asylum application statements were all translated by different individuals. Wang also argues that thousands of Chinese refugees are persecuted based on religion, so it stands to reason that their asylum applications would be very similar. There is an important distinction, however, between applications that are very similar and applications that are identical in many respects. Although it is true that applicants' narratives might overlap without being met with suspicion, if—as is the case here—the applicants have identical narratives, the IJ may require the applicant to explain the similarities. In response to such a request from the IJ in this case, Wang failed to provide an adequate explanation.[1]

Wang also failed to adequately corroborate his religious persecution claims. Although Wang did provide a letter from his wife, the letter was extremely vague and provided no details about his alleged mistreatment or any information regarding his family's participation in the underground church. Wang did not offer letters of corroboration from the members of his church in China or any corroboration of his continued practice of Christianity in the United States. "[W]here it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided." *Lin v. Holder*, 565 F.3d 971, 977 (6th Cir. 2009) (quoting *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004)). The failure to produce reasonably available corroborative evidence supports a finding that the applicant has failed to meet his burden of proof. *Abdurakhmanov v. Holder*, 735 F.3d 341, 347 (6th Cir. 2012). Accordingly, the failure to produce reasonably available corroborative

---

[1]Wang also argues on appeal that the IJ's adverse credibility finding did not go to the heart of Wang's claim. However, this is a REAL ID Act case, and the IJ could base her adverse credibility determination on a variety of considerations without regard to whether those considerations go to the heart of Wang's claim. *See El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009); 8 U.S.C. § 1158(b)(1)(B)(iii).

evidence supports the BIA's determination that Wang failed to show his eligibility for asylum based upon religious persecution.

The IJ's and BIA's denials of his application were accordingly supported by substantial evidence and must be upheld.  Under the substantial evidence standard, we must uphold factual determinations unless any reasonable adjudicator would be compelled to conclude to the contrary.  8 U.S.C. § 1254(b)(2)(B); *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004).

Because Wang has failed to demonstrate eligibility for asylum, he cannot meet the standard for withholding of removal, which is more stringent.  *See Ndrecaj v. Mukasey*, 522 F.3d 667, 677 (6th Cir. 2008).  Moreover, where an applicant has "failed to satisfy the threshold showing of credibility to warrant withholding of removal under the Act, it logically follows that he cannot demonstrate that he is entitled to relief under the CAT."  *Zhao v. Holder*, 569 F.3d 238, 249 (6th Cir. 2009).

The petition for review is accordingly denied.