# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 12, 2021

Lyle W. Cayce
Clerk

No. 19-60937

DALJINDER SINGH,

*Petitioner*,

*versus*

MERRICK GARLAND, *U.S. Attorney General*,

*Respondent*.

Petition for Review of the Order of the
Board of Immigration Appeals
BIA No. A215-908-418

Before HIGGINBOTHAM, SOUTHWICK, and WILLETT, *Circuit Judges*.
PATRICK E. HIGGINBOTHAM, *Circuit Judge*:*

Daljinder Singh applied for asylum and protection under the Convention Against Torture, claiming that he feared persecution in India based on his membership in the Akali Dal Amritsar ("Mann Party"), a Sikh-dominated political party. The presiding immigration judge ("IJ") denied his

---

* Judge Willett concurs in the stay only.

application, finding Singh not credible. The Board of Immigration Appeals ("BIA") dismissed Singh's appeal. Singh filed a petition for review and moved for a stay of removal. We granted Singh an emergency stay of removal pending further order. We now grant Singh a stay pending review of his petition.

**I**

Singh was a political dissident in Punjab, India, where he was twice assaulted by the party in power, the Bharatiya Janata Party ("BJP"), because of his membership in the Mann Party. He alleges that he was first attacked on June 1, 2018, while hanging posters for the Mann Party. Four people in BJP t-shirts came over and told him to join their party. When he refused, they started beating him. People nearby heard his screams and came to his aid, causing the attackers to flee. Singh spent two days in the hospital receiving treatment for a muscle tear in his thigh and other injuries. When Singh and his father tried to report the attack to the police, the police refused to accept his report because the BJP was the party in power. The police also threatened to prosecute Singh for filing false charges if he returned to the police station.

Two months later, Singh was walking home when four BJP party members forced him into their car and took him to a rural area where they beat him with field hockey sticks and hit him in the face with a metal bangle. Farmers in the area heard Singh screaming and came to his rescue. His assailants fled, telling Singh they would kill him next time. After the attack, Singh had a five-day hospital stay for injuries to his head, leg, and chin. After being discharged, Singh did not report the attack to the police because of their earlier threat. Instead, he stayed with his sister who lived about 45 miles from his home. Singh's father hired a smuggler, who brought Singh to Mexico. Since leaving India, Singh claims that BJP members have attacked his father twice and his mother once in their search for him.

At his asylum hearing, the IJ, Agnelis Reese, noted that "since October [2019] when a wave of respondents from India have arrived, there has been an emerging pattern and an eerie similarity between the statements presented by the respondents in either credible fear proceedings or in their asylum applications." Singh's claim, she asserted, presented the same fact pattern:

> The respondents all appear to be from small farms in, or small towns or villages in India. They all say that they are farmers. All of them appear to be in their early to mid-twenties. They all leave with passports or arrangements made by family members. Some of them know the amount of money paid, some don't. But before they leave their country, in general they say that they had become members of the Mann party. And usually within six to eight months of them joining the Mann party, they are attacked by members of the BJP party. Almost without fail, it is four people who come out of a vehicle, ask them to leave their party and join theirs to sell drugs. If the person refuses, they are beaten. Usually someone comes along and the beating is stopped. But as they leave, they tell them that next time they will kill them. Usually within a few months there is a second encounter, usually with four people. And almost without fail, during the second beating, farmers hear the screams or cries of the respondents and then they appear and rescue the workers and then, or rescue the respondent, and within a few months of that, the respondents leave the country of India, usually with the assistance of agents or someone to assist them in smuggling.

The IJ also noted that the respondents allege their attackers beat them with "sticks, wooden sticks and [field] hockey sticks." The IJ then asked Singh's counsel if he wanted to address the similarities.

Singh's counsel provided explanations during the hearing for many of these similarities. As field hockey is India's national sport, counsel argued

that field hockey sticks, like baseball bats in the United States, are prevalent and "the instrument of choice to inflict pain." Counsel also contended that Punjabis, like Singh's family, are predominantly farmers, so the frequent references to farmers merely reflected Punjab's agricultural economy. He also pointed to reports of rampant corruption in India's police forces. The IJ found "Respondent's counsel['s] explanation [for the similarities] insufficient to rebut the repetitive narrative of applicants from India," but she did not further elaborate. Based on Singh's similar asylum claim and two inconsistencies between Singh's testimony and the evidence in the record, the IJ made an adverse credibility finding, which the BIA affirmed based on the IJ's stated reasons. Singh filed a petition for review and a motion for a stay of removal, which we granted pending further order.

## II

We consider four factors in determining whether to grant a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[1] The first two factors are the "most critical."[2]

## A

Singh raises two principal arguments in his petition for review. First, he contends that the IJ's near total denial rate for asylum applications reflected a bias and violated Singh's due process rights. Second, he challenges the BIA's conclusion that the IJ adhered to the procedural

---

[1] *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotation marks and citation omitted).

[2] *Id.*

safeguards the BIA adopted in *Matter of R-K-K-*, applicable when an IJ relies on inter-proceeding similarities for an adverse credibility determination. We conclude that Singh has made the requisite showing that he is likely to succeed on the merits of both claims.

"It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."[3] "[T]he IJ must conduct deportation hearings in accord with due process standards of fundamental fairness."[4] Due process requires that an individual "be provided notice of the charges against him, a hearing before an executive or administrative tribunal, and a fair opportunity to be heard."[5] To succeed on a due process claim, a petitioner "must make an initial showing of substantial prejudice," which requires demonstrating "that the alleged violation affected the outcome of the proceedings."[6]

The IJ here denied relief to asylum seekers in 203 of the 204 cases she presided over from 2014 to 2019, a denial rate of 99.5%. There can be no "right" denial rate. Denial rates vary: from 2014 to 2019, the nationwide

---

[3] *Reno v. Flores*, 507 U.S. 292, 306 (1993); *see also Okpala v. Whitaker*, 908 F.3d 965, 971 (5th Cir. 2018). Procedural due process applies also to asylum hearings. *See, e.g.*, *Alvarado-Molina v. INS*, No. 00-60579, 2002 WL 432384, at *4 (5th Cir. Feb. 25, 2002) (unpublished) (per curiam) (considering claim that BIA violated due process in denying asylum claim); *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1039 (5th Cir. Unit B 1982) (finding that the right to petition for asylum "is sufficient to invoke the guarantee of due process"); *see also, e.g.*, *Canales-Rivera v. Barr*, 948 F.3d 649, 656 (4th Cir. 2020) ("To be sure, deportation and asylum hearings are subject to the requirements of procedural due process.").

[4] *Animashaun v. INS*, 990 F.2d 234, 238 (5th Cir. 1993).

[5] *Okpala*, 908 F.3d at 971.

[6] *Id.* (citing *Anwar v. INS*, 116 F.3d 140, 144 (5th Cir. 1997)).

denial rate ranged from 25% to 50%.[7] Still, a consistent and near total denial rate can engender the appearance of bias. We find it likely that a "reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality."[8]

Singh argues that several instances of the IJ's conduct and her failure to apply the procedural safeguards adopted by the BIA in *Matter of R-K-K-* are evidence of substantial prejudice. Though we disagree that some of the IJ's conduct is sufficient to show prejudice, we find that Singh has made the requisite showing that the IJ's bias affected the outcome of his asylum proceedings based on her noncompliance with *Matter of R-K-K-*.

Singh first points to the IJ smirking and rolling her eyes, referencing Singh's testimony of attacks against his father as "self-serving," and seemingly disregarding some of the evidence Singh put forward. "[J]udicial remarks . . . that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases ordinarily do not support a bias or partiality challenge."[9] They only do so "if they reveal an opinion that derives from an extrajudicial source" or "if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."[10] None of the IJ's statements or conduct referenced by Singh reveal either an opinion from an extrajudicial source or a high degree of antagonism.

---

[7] EXEC. OFF. FOR IMM. REV., DEP'T OF J., ADJUDICATION STATISTICS: ASYLUM DECISION RATES, (July 14, 2020), https://www.justice.gov/eoir/page/file/1104861/download.

[8] *United States v. Avilez-Reyes*, 160 F.3d 258, 259 (5th Cir. 1998) (quoting *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 800 (5th Cir. 1986), *aff'd* 486 U.S. 847 (1988)).

[9] *Liteky v. United States*, 510 U.S. 540, 556 (1994).

[10] *Id.*

Singh next points to the IJ's failure to comply with the procedural safeguards required when an IJ relies on inter-proceeding similarities as another way in which the IJ's bias affected the outcome of his claim. "Inter-proceeding similarities" can inform an adverse credibility determination but must be reviewed "with an especially cautious eye."[11] In *Matter of R-K-K-*, the BIA adopted a three-part framework for IJs to use when relying on inter-proceeding similarities:

> First, the Immigration Judge should give the applicant meaningful notice of the similarities that are considered to be significant. Second, the Immigration Judge should give the applicant a reasonable opportunity to explain the similarities. Finally, the Immigration Judge should consider the totality of the circumstances in making a credibility determination. Each of these steps must be done on the record in a manner that will allow the Board and any reviewing court to ensure that the procedures have been followed.[12]

The BIA explained that "[t]his framework will permit Immigration Judges to draw reasonable inferences of falsity from inter-proceeding similarities while establishing procedural safeguards to protect faultless applicants."[13]

The IJ here did not comply with these procedures. At the first step, the IJ must identify the similarities, notify the applicant, and provide the applicant "with copies of the statements or documents in question and explain how the similarities appear to undermine the applicant's credibility."[14] In *Matter of R-K-K-*, the IJ identified similarities between the

---

[11] *Matter of R-K-K-*, 26 I&N Dec. 658, 661 (BIA 2015).

[12] *Id.* (quoting *Mei Chai Ye v. U.S. Dep't of Justice*, 489 F.3d 517, 520 (2d Cir. 2007)).

[13] *Id.*

[14] *Id.* at 661.

claims of the respondent and his brother, providing "identical wording, typographical and spelling errors, and spacing irregularities in describing the same events" and pointing out their use of plural pronouns even though only the brother's declaration referred to a second person.[15] Here, the IJ did not compare the petition to specific applications, instead orally describing an amalgam of applications that she had previously seen.[16] Nor did the IJ identify "a substantial number of instances where the same or remarkably similar language is used to describe the same kind of incident or encounter."[17] As a result, Singh could not meaningfully compare the language and narratives, produce evidence to explain the similarities, or draw attention to important distinctions. A composite description provides only a distillation of several petitions and a glimpse into the mind of the IJ, an insufficient foundation for the fine-grained comparisons that are needed for inter-proceeding similarities to have probative value.[18] For the same reasons, it precludes the

---

[15] *Id.* at 664-65.

[16] The Government argues that *Matter of R-K-K-* allows an IJ to consider similarities between "documents *or other evidence*" and so the IJ's identification of evidentiary similarities on the record suffices. *Matter of R-K-K-* does allow for an IJ to rely on similarities between documents or "other evidence," but an IJ is required to "notify the applicant of the similarities that need to be explained. The [IJ] should provide the applicant with copies of the statements or documents in question and explain how the similarities appear to undermine the applicant's credibility." *Matter of R-K-K-*, 26 I&N Dec. at 661. The requirement to provide copies of similarities from other proceedings is thus not limited to documentary evidence. Where those similarities are based on similar language, the IJ should provide copies of the documents containing similar language, and where the similarities are based on evidentiary overlaps, the IJ should provide copies of the witness statements or other records from other proceedings containing the similar evidence as far as confidentiality allows. *See id.* at n.3. A general sketch of factual similarities on the record, as the IJ did here, fails to provide the meaningful notice that *Matter of R-K-K-* requires.

[17] *Id.* at 661.

[18] *See Wang v. Lynch*, 824 F.3d 587, 592 (6th Cir. 2016) ("There is an important distinction, however, between applications that are very similar and applications that are identical in many respects."); *see also Mei Chai Ye*, 489 F.3d at 527 (holding reviewing court

BIA and appellate courts from engaging in the searching review that inter-proceeding similarities require.

Moreover, the IJ's decision describes several purported similarities that she did not raise at all during Singh's asylum hearing. These similarities include that the applicants in similar cases were attacked after hanging posters, that their injuries were largely bruises and swelling, that the applicants hid at relatives' homes, and that the applicants all arrived in Mexico and then crossed into the United States. Singh's counsel received no notice of these similarities prior to the IJ's decision.

Next, the IJ must provide the applicant with a sufficient opportunity to explain the similarities. Unless an applicant is already prepared to "offer a reasonable explanation or credible evidence to dispel doubts about the authenticity or reliability of the initial evidence," the IJ may continue the hearing to allow applicants to review the materials and gather evidence in support of their explanation. Practically, this often will require continuances to allow counsel to prepare. The respondent in *Matter of R-K-K-* had three months to prepare;[19] here, counsel had a few seconds. The IJ presented Singh's counsel with a sketch of the allegedly similar applications and asked counsel to respond. Counsel provided responses but was not given any opportunity to gather evidence to further respond to the IJ's concerns.[20] And

_____

can refer to IJ's determination that "striking inter-proceeding similarities are . . . evidence of a 'canned' story" when IJ scrupulously abides by procedural safeguards).

[19] *Matter of R-K-K-*, 26 I&N Dec. at 664.

[20] By counsel's own admission, he was unfamiliar with *Matter of R-K-K-* and its safeguards and did not request a continuance. The due process concerns that undergird these procedural safeguards compel the IJ to comply with them regardless of whether the applicant invokes them. *See id.* at 661.

counsel was given no opportunity to respond to the similarities the IJ first highlighted in her decision.

Finally, the IJ must consider the totality of the evidence. In addition to the inter-proceeding similarities, the IJ cited two inconsistencies between Singh's testimony and evidence in the record. First, the IJ referenced a dispute over the dates of medical certificates. Singh testified that he received medical documents after receiving treatment in India after both attacks, but the medical certificates provided in the record are dated December 15, 2018, when Singh was in the United States.[21] Singh argues that he was referring to two separate sets of medical documents—one set provided to him in India and another issued after he arrived in the United States.[22] Second, the IJ noted a factual discrepancy between Singh's testimony and a witness's letter. Singh testified that after one of the attacks, he was taken to the hospital by his father and a local farmer. The farmer submitted a letter in which he said Singh's father took him to the hospital, without mentioning whether the farmer accompanied them. While minor inconsistencies may be sufficient for an adverse credibility determination, the IJ's credibility finding must be supported by "specific and cogent reasons derived from the record" and based on the totality of the circumstances.[23] Given the accounts of multiple

---

[21] Though the medical certificates were issued on December 15, 2018, they reference the specific dates of treatment consistent with Singh's testimony about when he was attacked.

[22] The exchange between the IJ and Singh about the medical certificate dates was less than clear. However, when later asked to clarify, Singh specified that the medical records he testified to receiving in India were the prescriptions he was given when discharged and that the records the IJ was referring to were provided to his father after Singh left for the United States. Thus, Singh's testimony is clear that he was referring to two separate sets of medical records.

[23] *Wang*, 569 F.3d at 537 (internal quotation marks and citation omitted); *see id.* at 538 ("[A]n IJ may rely on *any* inconsistency or omission in making an adverse credibility

witnesses to the attacks on Singh, medical records, images of the attacks on his father, and witness testimony regarding the BJP's continued pursuit of Singh, Singh has made the requisite showing that the totality of the evidence does not support the IJ's credibility determination.

The appearance of bias painted by the denial of 203 of 204 asylum applications and the IJ's adverse-credibility determination, informed by her noncompliance with the procedural safeguards of *Matter of R-K-K-*, are here interlaced. We do not suggest that a high percentage of denials is sufficient to avoid an IJ's otherwise valid credibility determinations. Indeed, patterns in applicants' presentations are likely and may necessarily result in a higher denial rate if the shared basis for relief is inadequate. But here, the incredibly high denial rate, when coupled with the IJ's noncompliance with *Matter of R-K-K-*, presents a substantial likelihood that Singh will be entitled to relief upon full consideration by a merits panel.

## B

"[T]he burden of removal alone cannot constitute the requisite irreparable injury."[24] But, here, Singh also urges that upon removal, his life will be in jeopardy from the BJP party. Considering the evidence of multiple attacks by BJP members on Singh and on his parents in their search of him, we conclude that Singh has demonstrated sufficient probability of irreparable injury.[25]

---

determination as long as the totality of the circumstances establishes that an asylum applicant is not credible . . . ." (internal quotation marks and citation omitted)).

[24] *Nken*, 556 U.S. at 435.

[25] *See id.* at 434 (noting that an applicant for a stay must demonstrate more than "some possibility of irreparable injury" (internal citation and quotation marks omitted)); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) ("Consideration of the

## C

The third and fourth factors merge when the Government is the party opposing a stay.[26] There are competing public interests here: the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm," and the "public interest in prompt execution of removal orders."[27] There is no indication that the interest in prompt removal is "heightened" here—the record does not establish that Singh is "particularly dangerous" or that he "has substantially prolonged his stay by abusing the processes provided to him."[28] We conclude that the public interest here weighs in favor of a stay of removal.

Accordingly, we GRANT Singh's motion for a stay pending review of his petition.

---

likelihood of [physical danger if returned to his or her home country] . . . should be part of the irreparable harm inquiry." (citation omitted)).

[26] *Nken*, 556 U.S. at 435.

[27] *Id.* at 436.

[28] *Id.*